# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01208-COA

LYNN WILKERSON                                                    APPELLANT

v.

JOSH WILKERSON, TERI WILKERSON,                      APPELLEES
CURTIS WILKERSON AND KATHERINE
WILKERSON

DATE OF JUDGMENT:             09/29/2021
TRIAL JUDGE:                  HON. TANYA L. HASBROUCK
COURT FROM WHICH APPEALED:    JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       E. FOLEY RANSON
ATTORNEYS FOR APPELLEES:      WILLIAM W. BUSCHING
                              JOSH WILKERSON (PRO SE)
                              TERI WILKERSON (PRO SE)
NATURE OF THE CASE:           CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                  AFFIRMED - 01/10/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     The matriarch of a family drafted a will.  In the will she included a series of devises of real and personal property.  Each section carefully specified that a relative or family friend "shall" receive certain property, except one section which requested that her sons "should have first choice to buy" her "Home & land."

¶2.     According to one of the sons, he never received the opportunity to purchase his mother's real property, as he believed was guaranteed by her will.

¶3.     The trial court ruled that his mother's usage of the word "should" was not mandatory, but permissive, so the property was not required to first be offered to the son.  Nonetheless,

the trial court held that testimony established he had actually been given the chance to purchase the property but rejected it.

¶4. The son appealed. Finding no error, we affirm.

## BACKGROUND

¶5. As the trial court phrased it, this case is about "what may be called an extended family compound where various family members of the Wilkerson branch own various parcels of property that adjoin each other" in the Vancleave community in Jackson County.

¶6. The mother of the family was Shirley Wilkerson. She had several children and those she claimed as children. In 2014 she wrote a will. At the beginning it stated:

> The names of my children are:
>
> > Josh Wilkerson
> > Teri Wilkerson
> > Steven Wilkerson
> > Lynn Wilkerson
> > Bonnie Wilkerson
> > Wayne Wilkerson

¶7. Over two typed pages carrying her written initials at the bottom, Mrs. Wilkerson next set out a series of specific bequests. With her phrasing intact, the will declared:

> 1. House & land shall be distributed to Josh & Teri Wilkerson. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.
>
> 2. Rings shall be distributed to Bonnie & Teri. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.
>
> 3. Chain & Cross shall be distributed to Becky Wilkerson. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.

4. Antique wash stand shall be distributed to Lavonda Wilkerson. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.

5. All Clothing shall be distributed to Butch Harper for charity. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.

6. If Josh & Teri deside to sell home & land. Lynn & Steven Wilkerson should have first choice to buy said Home & land. shall be distributed to _____ . If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.

7. My remaining tangible personal property shall be distributed to The ones already named. If this beneficiary does not survive me (or is not in existence), this bequest shall be distributed with my residuary estate.

(Spellings and blank in original).

¶8.     Mrs. Wilkerson passed away in 2018.  Per subsection 3 of the will, her "House & land" passed to Josh and Teri.  The land was 1.79 acres in Jackson County.  While Mrs. Wilkerson listed Josh first as one of her children, he was technically her grandson from her daughter Teri.

¶9.     One of Mrs. Wilkerson's other sons Lynn was in his sixties when she passed.  And subsection 6 of the will stated, "If Josh & Teri deside to sell home & land, Lynn & Steven Wilkerson should have first choice to buy said Home & land."  They did decide to sell it, and Steven told them he was not interested.

¶10.    What happened next is in dispute.  Despite the will, Lynn would claim he was never given the chance to buy his mother's property from Josh and Teri.  Instead, the property was sold to someone he disliked—his son, Curtis, along with his son's wife Katherine.

¶11.    So Lynn sued his nephew Josh, sister Teri, son Curtis, and daughter-in-law Katherine.

3

He demanded that "Josh Wilkerson and Teri Wilkerson be ordered to convey the subject property to Plaintiff for the same consideration paid by Defendants Curtis Wilkerson and Katherine Wilkerson free and clear of all liens and encumbrances[.]"

## PROCEDURAL HISTORY

¶12. The Jackson County Chancery Court conducted a trial over the dispute. During the bench trial, Lynn testified "[e]verybody knew" he was supposed to have a right to purchase his mother's property. "Everybody read the will," he said. While he was not sure Teri really wanted to sell the property at all, he thought Josh "wanted some money."

¶13. But Lynn balked at the price Josh and Teri wanted for his mother's property—$80,000—which included a lien for back taxes. "And we talked about the price and stuff on it," Lynn said. "And I told them the house, I didn't think, was worth that much. That's why I wanted to get it appraised, because the old house was rotting and falling down."

¶14. On cross-examination, Lynn reiterated, "I told [Teri] I didn't think it was worth that much, that I would get it appraised and I would pay appraisal price on it. And that's when Josh said he had a buddy that was an appraiser, and I told him I would get one myself."

¶15. But Lynn never hired an appraiser. To him, the talks about purchasing the house were ongoing. While in his view he never made an offer, he "[d]idn't say I didn't want it, either. I ain't said the first time that I wasn't interested in it." Lynn was adamant he never declined: "I never did say I didn't want to buy the property."

¶16. While Lynn would dispute it, other family members said he rejected Josh and Teri's offer, instead counter-offering $20,000. An exhibit admitted at trial showed text messages

4

from Josh stating, "We offered the house and land to Lynn and Steve and Wayne on March . . . 14 for 80,000 and no one wanted to buy it and Lynn wanted to give 20,000 for the place."

¶17.    So in Josh's and Teri's minds, Lynn had rejected purchasing the property at their offered price.  Next, they offered the property to Lynn's son Curtis, who was married to Katherine.  Lynn and Curtis did not get along; the father would say, "I've got my reasons" for not having a relationship with his son.  Curtis explained he had been estranged from his father since his teenage years, and indeed at the time of trial, they had not even spoken for fifteen years.

¶18.    Regarding the dilapidated house, Curtis and Katherine decided they were "going to fix it up and keep it," in part to honor his grandparents, "to look real good for them, how they always wanted it and they never got an opportunity to do that" while they were alive.  The couple wanted "[t]o keep the house in the family[.]"

¶19.    The couple ultimately paid Josh and Teri $65,200 for the property, as it was still burdened with a tax lien that was about $14,800.  This totaled $80,000, the same price that Josh and Teri had offered to Lynn.

¶20.    The trial court also heard from Tim Ray Havard—Teri's husband and Josh's stepfather.  He explained exactly how Josh and Teri attempted to sell the property to the various Wilkerson men, including Lynn.  They first went to Steve's house, who declined to buy it.  Teri's "brother lives right across the street," so they went to Wayne's house, who also declined to buy it.  "So we asked Lynn did he want to buy it."  Tim Ray said Lynn "asked what did they want."

5

¶21.    When told the asking price for Mrs. Wilkerson's home and property was $80,000, the witness testified Lynn "started laughing." "He said, it ain't worth but like 15 or 20 thousand, is all he said," and Tim Ray said, "[W]ell, that's what they want for it." According to him, Lynn replied, "I ain't paying that, so that's what was said."

¶22.    Tim Ray recounted how Lynn later approached him when they were cleaning out the house, "and he come up and he told me to tell Teri that if she wanted to sell it, that he would buy it, he had the money for it." "I went home," he testified, and "I told her, but it was too late because they had done sold it to the other boy."

¶23.    The trial court ultimately declined to rule in favor of Lynn. It held that Mrs. Wilkerson's use of the word "should" in her will "was a permissive and not a mandatory provision."

¶24.    "Furthermore, the weight of the testimony and evidence at trial demonstrated that Lynn Wilkerson had been given an opportunity to purchase the house," the trial court determined, finding Lynn had declined to purchase the real property through either inaction or refusal.

**DISCUSSION**

¶25.    Lynn raises two core issues before this Court. First, he argues he had "a mandatory right of first refusal to purchase the property in question" under his mother's will. Second, he argues the trial court erred in finding Lynn was indeed given a chance but declined to exercise it. He also claims Josh and Teri should not have been allowed to testify during the trial because they had not responded to his complaint.

6

## I.     The word "should" in the will was permissive.

¶26.    We must first determine if Mrs. Wilkerson created a mandatory or permissive requirement when she included this language in her will:

> If Josh & Teri deside to sell home & land. Lynn & Steven Wilkerson should have first choice to buy said Home & land.

¶27.    Our Supreme Court has "said in numerous cases that the fundamental rule governing the construction of all wills is to ascertain the intent of the testator." *In re Granberry's Est.*, 310 So. 2d 708, 711 (Miss. 1975).  "This intent must be gathered from the entire will or as is sometimes said 'from the four corners of the instrument,' giving due consideration and weight *to every word in the will*."  *Id*. (emphasis added).

¶28.    So we do not look at one word in a will in isolation to determine its meaning but turn to the testament as a whole because "[t]he language used in a *single* clause or sentence does not control against the purpose and intention as shown by the *whole* will."  *Id*. (emphasis added).

¶29.    The best way for us to understand what "should" means is to look at the ordinary language used by Mrs. Wilkerson.  We will not strain to interpret the language of a will. "The will must be construed and the intention ascertained from the usual and ordinary meaning of the language expressed therein." *Dealy v. Keatts*, 157 Miss. 412, 128 So. 268, 270 (1930); *Hemphill v. Robinson*, 355 So. 2d 302, 306 (Miss. 1978) ("The words of a Will are to be construed according to the rules of construction applicable to ordinary speech, except when technical terms are employed.").

¶30.    First, "unlike the discretionary nature of 'may,' the word 'shall' is a ***mandatory***

7

directive." *Ivy v. Harrington*, 644 So. 2d 1218, 1221 (Miss. 1994) (strong emphasis by the Court). In the section of her will disposing of her property, Mrs. Wilkerson included seven sections; six of the seven included the instruction "shall." "House & land shall be distributed to Josh & Teri" she commanded, just as "Rings shall be distributed to Bonnie & Teri," and "Chain & Cross shall be distributed to Becky," the "Antique wash stand shall be distributed to Lavonda," and "All Clothing shall be distributed to Butch Harper for charity." The last clause, a catch-all, required that "My remaining tangible personal property shall be distributed to The ones already named." With great clarity, Mrs. Wilkerson declared exactly what she wanted regarding this specific property.

¶31. Only once among the seven sections did Mrs. Wilkerson write something "should" happen. The first devise was to Josh and Teri of her home and real property. Section 6 stated that "If Josh & Teri deside to sell home & land," then her sons Lynn and Steve "should have first choice to buy said Home & land."

¶32. This "should" provision is clearly unlike the six other "shall" sections. Giving due consideration to every word in the will, Mrs. Wilkerson made the decision that if and when Josh and Teri decided to sell, then Lynn and Steve should get first dibs. She did not *require* Josh and Teri to do this, but instead asked them to first consider her other sons before turning outside the close family circle.

¶33. As the trial court held, "[h]ad it been the intent of the decedent that Lynn Wilkerson and Steve Wilkerson had a mandatory first option to buy the house . . . if Josh and Teri [had] decided to sell, the testator would have . . . used the term 'shall' as she did in every other

8

section of her bequests." But "Shirley did not do this," so the trial court concluded "that it was the testator's intent that section 6 was a recommendation and not a mandate."

¶34. Lynn would have us unmoor the word "should" from the rest of his mother's will and interpret this word alone. He argues a previous case from the Supreme Court interpreted the word "should" as a mandatory condition, which requires us to construe his mother's will the same. *See Miss. Comm'n on Jud. Perf. v. Ishee*, 627 So. 2d 283, 287 (Miss. 1993) (interpreting as mandatory a judicial canon that stated, "A judge should resign his office when he becomes a candidate either in a party primary or in a general election for a non-judicial office").[1]

¶35. But this argument ignores precedent that requires us to use the *usual and ordinary* meaning of the language in a will, not a legal definition reached under the unique facts of one case interpreting a judicial canon. In reviewing the four corners of her testament, Mrs. Wilkerson used the word "should" only once, and that one time was when she determined Lynn "should have first choice to buy said Home & land." The trial court was correct to interpret her usage of the word "should" as permissive, and not mandatory.

¶36. There is another key distinction. Mrs. Wilkerson had the authority to devise her own property to who she chose. But section 6 was something different. The first section clearly devised her "House & land" to Josh and Teri; no party disputes this fact.

¶37. In contrast, section 7 was not a devise of property. Instead, it was only a *request* made

---

[1] The canon has subsequently been corrected. The modern version sets out that "[a] judge *shall* resign from judicial office upon becoming a candidate either in a party primary or in a general election for a non-judicial office[.]" Miss. Code of Jud. Conduct Cannon 5A(2).

of Josh and Teri that would occur only if they "deside to sell home & land." In this event, Mrs. Wilkerson requested Josh and Teri to allow her sons Lynn and Steven to "have first choice to buy said Home & land." In decades past we would have called this subsection a "precatory" provision, meaning permissive and non-binding; it is merely "a request or prayer directed to a devise or legatee concerning the devise or legacy given him[.]" *Brown v. Franklin*, 157 Miss. 38, 127 So. 561, 564 (1930).

¶38. As the Supreme Court has determined, "words expressing merely a suggestion, wish, or request ordinarily are of a precatory character only" and therefore permissive and not mandatory. *Farmer v. Broadhead*, 230 So. 2d 779, 781 (Miss. 1970). Mrs. Wilkerson's use of "should" in her will was therefore only a suggestion or wish that Josh and Teri consider Lynn and Steven first before selling off her home. The trial court was correct to conclude the use of the word "should" in this section was not a mandatory requirement.

## II. Lynn was given a chance to buy the property.

¶39. In the alternative, Lynn argues the trial court erred when it found he was given a chance to purchase his mother's home and property. Specifically, he "was not given reasonable notice so that he could make an informed decision to exercise his right of first refusal."

¶40. Yet the holding that "the weight of the testimony and evidence at trial demonstrated that Lynn Wilkerson had been given an opportunity to purchase the house" was a finding of fact by the trial court. "Our scope of review of findings of fact is severely limited," and "[f]indings of fact made by a chancellor which are supported by credible evidence[ ] may not

10

be set aside on appeal." *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985).

¶41.    There was testimony from multiple witnesses that Lynn had actually been provided a chance to purchase his mother's property from Josh and Teri—even though Mrs. Wilkerson's will only requested he be given such an opportunity.

¶42.    Critically, Lynn himself swore under oath that "we talked about the price and stuff" for his mother's former home and acreage, but that he did not want to pay the price Josh and Teri wanted for it. "And I told them the house, I didn't think, was worth that much." Teri's husband testified that when Lynn was told the price was $80,000, he laughed, and declared "it ain't worth but like 15 or 20 thousand." He recalled Lynn telling him, "I ain't paying that."[2]

¶43.    There was credible evidence supporting the trial court's conclusion that Lynn was offered but rejected a chance to buy his mother's property. And given our deference to the

---

[2] Lynn also raises as error on appeal "that the testimony of Teri and Josh should have been struck and not considered by the trial court in reaching a final judgment." He argues his relatives were in default for failure to answer his complaint and should not have been allowed to testify as a result.

However, in his brief he concedes the documents regarding the alleged service of the complaint and their failure to respond "are not included in the Clerk's Papers[.]" Lynn also does not cite any cases in support, so we will not consider this argument. *See generally* MRAP 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."); *Rowell v. State*, 347 So. 3d 231, 237 (¶¶34-37) (Miss. Ct. App. 2022) (reiterating the appellant's duty to provide a record sufficient to claim error); *Carter v. Carter*, 324 So. 3d 327, 331 (¶18) (Miss. Ct. App. 2021) ("The fact that [a party] failed to provide case cites places his appeal beyond our need to consider it.").

Nonetheless, even if Josh and Teri had been precluded from testifying, Lynn's own repeated admissions that he was offered the land but thought the price was too high, coupled with the testimony of Tim Ray Havard about Lynn's rejection, were sufficient for the trial court to rule as it did.

trial court, who was sitting as a finder of fact, we decline to reverse on this issue.

## CONCLUSION

¶44.    To interpret a will we look to the four corners of the instrument, giving weight to each word.  The author of the will created a permissive condition by using the word "should" only once in contrast to her repeated usage of the word "shall."  Even though there was no mandatory requirement for her son to receive an opportunity to purchase her home and land, there was proof that he had such a chance.  There was no error in this case; therefore the trial court's judgment is **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**